UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:18-CR-79 (KAD) |
| ERIC CHAMBERS | : | July 12, 2019 |

## MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL BY ERIC CHAMBERS

After a jury trial, Mr. Eric Chambers was convicted of four counts of aiding and abetting Hobbs Act robberies (or attempted robberies) in violation of 18 U.S.C. §§ 1951 and 2. Mr. Chambers has moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure as to each of these counts. The grounds for Mr. Chambers' Rule 29 motion appear in a separately filed memorandum. Should the Court deny relief pursuant to Rule 29, Mr. Chambers requests that the Court vacate the jury's verdict and order a new trial under Fed. R. Crim. P. 33 for the reasons that follow.

Specifically, as outlined below, 1) the supplemental jury instructions caused the jury improperly to analyze the evidence cumulatively; 2) the circumstances surrounding the dismissal of a juror created an appearance of injustice; 3) the government engaged in prejudicial misconduct in its closing; and 4) the evidence does not support the verdict.

**RULE 33 STANDARD**

On a defendant's motion, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, *see United States v. Leslie,* 103 F.3d 1093, 1100-01 (2d Cir.1997), but also where a jury's verdict is contrary to the weight of the evidence, *United States v. Ferguson*, 246 F.3d 129, 136 (2d Cir. 2001), and where any other circumstance that might render the trial "essentially unfair," including trial errors. *See United States v. Muyet*, 994 F. Supp. 501, 520 (S.D.N.Y. 1998) (*citing United States ex rel. Darcy v. Handy*, 351 U.S. 454, 462 (1956)).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." *Autuori*, 212 F.3d at 120 (citing *Sanchez*, 969 F.2d at 1413). And, in contrast to a Rule 29 motion, a district court need not view the evidence in the light most favorable to the government. *United States v. Lopac*, 411 F. Supp.2d 350, 359 (S.D.N.Y. 2006).

**ARGUMENT**

A.      **The Supplemental Jury Instructions Caused the Jury Improperly to Analyze the Evidence Cumulatively.**

On the second day of deliberation, the jury submitted a note pointedly addressing a core instructional issue that had been the subject of extensive disagreement between the parties throughout the case. The note inquired:

> Do we look at each offense as separate events or, through common sense, can we use info from one -- from other offenses and apply to each offense? As an example, if his car appears at more than one event, can we use that info during our deliberations? We ask because there is a repetitive pattern, yet we want to judge each count separately. Thank you.

2

Doc. 220 at 3. As discussed below, the Court's response to this note misled the jury and created a substantial likelihood that the jury did not apply the correct legal standard in reaching its verdict.

     *1.  The law requires the jury to examine each count independently.*

The answer to the jury's question is long-established and unequivocal: to cure the prejudice inherent in multiple-count trials, the jury cannot be permitted to use "common sense" to draw conclusions from an apparent pattern formed by the relationship of separate counts. As Judge Learned Hand long ago explained (in language quoted by the defense in reference to this issue):

> There is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all. This possibility violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition.

United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939), *accord United States v. Halper*, 590 F.2d 422, 430–31 (2d Cir. 1978), *United States v. Pinto-Thomaz*, No. S2 18-CR-579 (JSR), 2019 WL 1460613, at *4 (S.D.N.Y. Jan. 15, 2019). *See also* Doc. 220 at 12.

The established solution to this risk of the jury improperly viewing the evidence cumulatively is that, where counts are properly joined and not severed for trial, the jury should be instructed "that it **must give separate consideration** to each individual defendant and **to each separate charge** against him." *Zafiro v. United States*, 506 U.S. 534, 541 (1993) (emphasis added; internal quotation marks omitted; quoting and approving of district court's jury instructions).

In a representative demonstration of the application of *Zafiro*, the Third Circuit has explained:

> Mathis' argument overlooks the well-established principle that any potential prejudice from the joinder of multiple counts can be minimized by instructing the jury that each count charged is a separate offense and thus should be considered independently. *See Zafiro v. United States*, 506 U.S. 534, 539, 113

S. Ct. 933, 122 L.Ed.2d 317 (1993). We presume that jurors follow such instructions. *Zafiro*, 506 U.S. at 540, 113 S.Ct. 933.

> The District Court appropriately told the jury to "separately consider the evidence that relates to each offense and return a separate verdict for each offense[.]" It also admonished the jury that their decision as to "one offense ... should not influence [their] decision on the other offenses," and the court told them not to "speculate as to the nature of [Mathis' previous]conviction." Thus, the jurors knew that evidence of other crimes must not be used as "proof of a crime charged in this case." *See generally United States v. Page*, 657 F.3d 126, 131 (2d Cir.2011).

*United States v. Mathis*, 568 F. App'x 149, 153 (3d Cir. 2014) (emphasis added). As *Zafiro* and *Mathis* (among many other cases) recognize, there is inherent in multiple-count cases a risk that the jury might convict a defendant as to a particular count for reasons extrinsic to the factual proof of that count standing alone. <u>That risk is unacceptable</u>. BUT, courts have recognized, that unacceptable risk can (indeed must) be mitigated through clear and unambiguous jury instructions.

The federal reporters are replete with examples of these required admonitions. In *United States v. Christie*, 717 F.3d 1156 (10th Cir. 2013), then-Judge Gorsuch emphasized that "[t]he district court took care to instruct the jury to consider each count independently without regard to others." *Id.* at 1175.

In a recent case in this district, Judge Shea likewise specified that "[t]he Court also gave instructions designed to ensure independent consideration by the jury as to each count." *United States v. Mack*, No. 3:13-CR-00054 (MPS), 2016 WL 4373695, at *11 (D. Conn. Aug. 15, 2016).

And in a 2014 case in the Eastern District of New York, which concerned four independent burglaries all charged together, Judge Kuntz explained to the jury: "You're going to be considering a number of counts and you're going to consider them independently of the others and you're going to reach a verdict with regard to each of the counts." *Hicks v. Bellnier*, 43 F. Supp. 3d 214, 228–29 n. 5 (E.D.N.Y. 2014). *See also, e.g. United States v. Green,* 563 F. App'x 913, 918 (3d Cir. 2014) multiple-

4

count trial permitted where "the jury could compartmentalize the evidence supporting each count and the District Court gave proper limiting instructions to this effect," including that "Each offense should be considered separately"); *United States v. Asante*, 161 F. App'x 3, 5 (D.C. Cir. 2005) ("the district court was within its discretion in refusing to sever appellant's trial from that of his co-defendants given the independent nature of the evidence against appellant and the district court's careful instructions to the jury to consider the evidence against each defendant on each count separately").

By way of contrast, the Fourth Circuit's decision in *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994), illustrates the fundamentally unjust consequences of permitting a jury to analytically conflate distinct counts. In *Tran Trong Cuong*, the defendant, a physician, was charged with "136 counts of unlawful distribution of [controlled prescription] drugs . . . . Following a jury trial, Tran was convicted of 127 counts . . . . He was acquitted of eight counts, and one count was dismissed prior to the verdict." *Id.* at 1133. A principal question on appeal concerned the "sufficiency of the evidence, particularly as to the 80 counts as to which there was no testimony from the patient receiving the prescription[.]" *Id.* at 1133-34.

On appeal, Defendant challenged the sufficiency of the evidence as to 80 counts "in which the patient who received the prescription did not testify. The government's case was made by the testimony of Dr. MacIntosh, copies of the prescriptions, and the introduction of exhibit 34, which is a summary report of the doctor's examination of 33 patient files taken from Tran's office." *Id.* at 1141. MacIntosh, the government expert, had not analyzed the 80 challenged prescriptions in depth, but had instead identified a pattern of allegedly inappropriate prescriptions across patients:

> No effort was made by the prosecution to focus his testimony on any of these 80 counts. In discussing the case of Emily Burns, who testified, Dr. MacIntosh was asked if medications given to this patient were justified. He stated, "This individual case taken by itself could be justified. Taking all the other cases together, and following the pattern that I have been reading for the 16 hours that

5

I read, I wouldn't think it was justified." He was later asked: "Doctor, you have determined and you testified today that the situation with Emily Burns was justified. Can you say that about any other patient here?" The doctor responded: "Well, some of the patients just had a few entries, there were just three or four entries. On that basis, I have no way of judging whether they were valid or not Because there was not enough ongoing relationship."

*Id.*

The Fourth Circuit flatly rejected the proposition that this sort of pattern evidence could provide a sound basis for conviction on these counts:

The government has convicted the appellant of 80 counts based upon the summary report of 33 patient files prepared and submitted by its medical expert and the testimony of the medical expert that the drug prescriptions contained in these files were made for other than legitimate medical purposes and beyond the bounds of medical practice. Although the witness admitted that he did not have sufficient information from some of the charts to conclude that the prescriptions were improper, **these charts were included in the exhibit and also formed the basis of separate counts in the indictment, simply because they followed a pattern. This is not sufficient to convict a person of a felony, and it concerns us that, as to these 80 counts, defendant may have been found guilty of some counts by association-the association of the counts properly proved with those that were not.**

*Id.* (emphasis added.)

The Court went on to reiterate its concern that the portions of Dr. MacIntosh's testimony quoted above were "an indication that each count in the indictment was not examined separately, but was presented as a part of a pattern." *Id.* at 1142. This analytic approach, the Fourth Circuit held, is unacceptable because "[a] defendant is entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt, if he is to be convicted." *Id.*

In a subsequent gloss of *Tran Trong Cuong*, the Fourth Circuit put the fatal flaw succinctly: "Essentially, the Government attempted to prove its case by generalizing." *United States v. Singh*, 54 F.3d 1182, 1188 (4th Cir. 1995).

2.  *The Court's instructions misled the jury.*

In response to the jury's note considering the appropriateness of pattern evidence, the Court proposed reiterating an already-given multiple-counts instruction while adding additional language:

> "Mr. Chambers -- whether you find Mr. Chambers not guilty or guilty of one count should not dictate your verdict regarding any other count." I'm then going to add, "There may be evidence, however, that you find, within the parameters of my instruction, goes to Mr. Chambers' involvement in one or more of the robberies. Such evidence may be considered by you with respect to one or more of the robberies; however, you must not find Mr. Chambers guilty of one count, simply because you may have found him guilty of another count," and then include the propensity language.

Doc. 220 at 11. The Court recognized that "I'm not sure it will necessarily answer their question regarding a pattern. I think that the question regarding a pattern, however, can be addressed through the propensity charge." Doc. 220 at 14.

Defendant urged the court repeatedly that the jury should be explicitly instructed that it could not analyze the evidence cumulatively and that "we would propose to instruct the jury specifically that you should not use pattern evidence." Doc. 220 at 15.

In response to the jury note, the Court provided the following supplemental instruction:

> Mr. Chambers has been charged with six offenses. The number of charges is not evidence of guilt and should not influence your decision in any way. You must consider each count separately and return a separate verdict of not guilty or guilty for each count. Whether you find Mr. Chambers not guilty or guilty of one count should not dictate your verdict regarding any other count; however, there may be evidence that you find, within the parameters of my instruction, that goes to one or more of the robberies. Such evidence may be considered by you with respect to these robberies; however, you must not find Mr. Chambers guilty of one count simply because you may have found him guilty of another count.
>
> With respect to your inquiry regarding a perceived pattern, you must not base your verdict on any perception that you may have that Mr. Chambers is of bad character or has a propensity to commit crimes.

7

Doc. 220 at 19 – 20.

The Court's supplemental instruction in response to the jury's note fundamentally failed to provide the jury with the clear and accurate legal direction required to ensure that the jury did not view the evidence collectively rather than examining the evidence, as it should have, as to each count independently.

The need for clear instructions to the jury was particularly acute in this case for the precise reason identified in the jury's note. The recurrent appearance of Mr. Chambers' car near the scene of various robberies is, as the jury put it, a "repetitive pattern" that common sense would say mean Mr. Chambers was up to no good.

Federal law provides specific pathways for introducing pattern evidence. Had the government charged Mr. Chambers and Mr. Brown with participating in an ongoing conspiracy to commit robberies, for example, the alleged pattern of their shared conduct together may have been collectively relevant to the single conspiracy charge. But, the government here did not charge Mr. Chambers with a conspiracy.

Likewise, the government did not seek to introduce evidence of a common scheme or plan through Rule 404(b) of the Federal Rules of Evidence. As the Court articulated, "really the case was not tried on a common scheme or plan theory," Doc 220 at 14, and accordingly "[t]he government, obviously, did not, in advance of the charge, request any sort of 404(b) or common scheme charge[.]" Doc. 220 at 10.

Because the government did not introduce admissible pattern evidence, the answer to the jury's question about whether they could consider pattern evidence was simple: no, they could not.

The jury's question, moreover, was not only about pattern evidence generally, but about a specific perceived pattern: the presence of Mr. Chambers' car at the scene of multiple robberies. No

8

evidence was offered, let alone admitted, suggesting that Mr. Chambers' car being present at a given robbery was relevant to any robbery but that robbery. Each time Mr. Chambers' car appeared it was allegedly connected *only* to the contemporaneous robbery. With respect to the pattern the jury specifically identified in its note, that is to say, there was not evidence that related to multiple counts.

The Court's answer to the jury's note, however, erroneously sent the exact opposite message. By asserting that "there may be evidence that you find, within the parameters of my instruction, that goes to one or more of the robberies," Doc. 220 at 19, in direct response to the jury's question regarding the recurring appearance of Mr. Chambers' car, the instruction invited the jurors to conclude something that the Court had already recognized the evidence did not support – namely, that pieces of evidence regarding the location/presence of Mr. Chambers' car at various robberies related to multiple robberies. Instead, the record evidence was such that there was no evidence presented of a common thread linking the robberies.

In the face of these factual circumstances, the Court's instruction not only led the jury astray, but it also departed from clearly established law, discussed above, showing that consideration of such pattern evidence is impermissible. The Court's broad caution regarding character evidence, moreover, did nothing to diminish this problem. Though the principle expressed by Learned Hand relates broadly to the inadmissibility of character or propensity evidence, the application of this principle under these circumstances relies upon a quite technical legal construct (or put more simply an artificial rule). As Learned Hand put it, "in the ordinary affairs of life such a disposition is a convincing factor, and its exclusion is rather because the issue is practically unmanageable than because it is not rationally relevant." *Lotsch*, 102 F.2d at 36. The legal principle, that is to say, prohibits extrapolation from one incident to another, even when such extrapolation would be perfectly rational outside the context of

9

this artificial rule. This does not diminish the force of the rule—but it does heighten the necessity of stating it clearly.

The jury note directly asked whether it was appropriate to use the logic of "the ordinary affairs of life." More specifically, the jury asked whether they could use "common sense." This term was one the government, in its rebuttal closing, had invoked in counterpoint to the defense's request that the jury strictly adhere to the rules governing permissible inferences, stating "Defense counsel has asked you to be citizen scientists. The government would ask you to use your common sense here." Doc. 219 at 161. Although the jury instructions at several points appropriately invited the jury to use common sense, in this context the correct answer to the question of whether they could use "common sense" to discern a pattern from which to infer guilt was an unequivocal "no." The jury needed to be given that answer. They were not.

> 3. *There is a reasonable likelihood that the misleading instructions led the jury astray.*

The Second Circuit has explained that "[i]n assessing the likely effect of imperfect instructions on the jury, we must view them in light of the jury charge as a whole. In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that is fundamentally unfair." *United States v. Elfgeeh*, 515 F.3d 100, 133 (2d Cir. 2008) (citations omitted).

In considering whether the Court's instruction had such an effect, notes submitted by the jury provide an important and appropriate source of insight: "While it is always difficult to get inside the heads of jurors, jury notes can provide a window through which a court can peer into the 'black box' of jury deliberation." *Cortijo v. Bennett*, No. 03CIV.5102 LAP GWG, 2010 WL 2079711, at *7 (S.D.N.Y. May 17, 2010), *aff'd*, 422 F. App'x 12 (2d Cir. 2011) (citation omitted).

Here, the jury's note lays bare the specific issue that they were concerned about: their uncertainty regarding how to properly assess the recurrent appearance of Mr. Chambers' car in the context of a multi-count indictment. That the initial instructions had left the jury uncertain on this point is shown by the very fact that they submitted a note. And the importance of the car—and the apparent pattern—can be seen as well in the mixed jury verdict. With respect to each robbery in which Mr. Chambers' car appeared, the jury returned a guilty verdict. As to each robbery in which the car did not appear, that is, those that did not fit the pattern, the jury returned a not guilty verdict. While typically a mixed verdict suggests that the jury was able to separate the counts and view them independently, *see, e.g.*, *Hicks*, 43 F. Supp. 3d at 229, here the <u>pattern</u> of guilty and not guilty verdicts strongly suggests that the jury did not separate the charges, but rather sorted them, grouping them into two categories: those in which the car appeared and those in which it did not.

*Hicks* also helps highlight another unusual feature of this particular case. In *Hicks* the Court emphasized that "the four crimes were easily segregable. The burglaries occurred on four different days, at four different locations, with four different victims, and different witnesses testifying as to each burglary." *Id*. at 229. On a superficial level, the charged robberies in this case had similar features. They occurred on different days and largely involved the testimony of different witnesses, though one witness testified to being the subject of both a robbery and later attempted robbery, and two of the incidents took place at locations with a single owner. But, Mr. Chambers was not charged with committing robberies. He was charged with aiding and abetting robberies in a case in which there was not a single piece of evidence showing that Mr. Chambers engaged in conduct that was, by its nature, inherently unlawful. Defendant did not dispute that Mr. Chambers' car was present at the scene of the robberies in which it appeared. Instead, the fundamental question for the jury concerned Mr. Chambers' state of mind at the time of each robbery. While it may be comparatively simple for

a jury to analytically separate the question of whether robberies on different days each actually happened, it is a much harder task to peer into the mind of a person—and to evaluate the person's mental state at different moments in a vacuum without, in essence, forming a generalized theory of the person. But, this is exactly the compartmentalized analytic thinking is what the jury needed to do in this case. It was not an easy task to get right—and one nearly impossible to accurately carry out in light of the Court's supplemental instruction.

>      **B.      A Juror Deliberately Lied to Hide a Government Relationship, the Government
>               Allowed the Tainted Juror to Remain Seated, and the Court Closed the
>               Courtroom Without Notice, Creating an Appearance of Injustice.**

>      *1. Factual background*

In an extraordinary development, on Friday, March 8, 2019—the third day of trial in this matter—the government told the Court and defense counsel that a sitting juror had a previously undisclosed "professional relationship for approximately two years with someone who currently works in the U.S. Attorney's Office who is a retired FBI agent. He has also met with FBI agents." Document 214 at 8. Per the government, moreover, the relationship "was such that it would be an incentive to [the juror] to act favorably for the government at the time of deliberations," Doc. 214 at 27, and was ongoing in nature. Doc. 214 at 10 – 11.

Based on this information the Court expressed that "if the defense had the information that it now has, I can't imagine that you wouldn't have stood up and said, Judge, we need this guy to go, and I would agree." Doc. 214 at 12. The government further acknowledged that "we do think [the juror] would have a strong incentive to not disclose and, in particular, not to publicly disclose the relationship that the government has brought to the Court and the parties' attentions." Doc. 214 at 17.

It is not clear when government personnel first became aware of this problem, but by the afternoon of Wednesday, March 6, 2019, (the first day of trial) this fact had been brought to the attention of the chief of the criminal division of the United States Attorney's Office. Doc. 214 at 13.

Government counsel provided additional ex parte information to the Court at sidebar. The Court ordered this portion of the transcript sealed, Doc. 214 at 18 – 20.  In explaining that it had closed the courtroom to hear sealed, ex-parte commentary from the chief of the criminal division of the United States Attorney's Office, the Court stated that "the Court further finds that there are extraordinary circumstances that would have made it impossible and inappropriate to try to provide any notice, as contemplated under the rules, of the Court's potential for acting in such a fashion." Doc. 214 at 24.

The Court subsequently canvassed the juror, who denied discussing the case with other members of the jury, and ordered the juror dismissed. Doc. 214 at 28 - 29. The following trial day, the Court denied defendant's request that the remaining members of the jury be asked if they had had discussions about the case with the departed juror. Doc. 215 at 11. Specifically, the Court ruled that "The issues that gave rise to his being excused don't implicate his ability to follow the Court's instructions," Doc 215 at 11, and that "I don't think under the standard that an individual inquiry of every juror on the suspicion, unfounded suspicion that he has not followed the Court's instruction is appropriate under the circumstances." Doc. 215 at 11.

2. *These circumstances potentially tainted the entire jury and created the appearance of injustice.*

The Second Circuit has explained knowingly lying during *voir dire* exposes a potential juror to significant criminal liability. *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989). Thus choosing to lie during *voir dire* "[exhibits] a personal interest in Such an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but **is also quite inconsistent with an**

13

**expectation that a prospective juror will give truthful answers concerning her or his ability to** weigh the evidence fairly and **obey the instructions of the court**." *Id.* at 151-52 (emphasis added, footnote omitted).

As these ramifications show, intentionally lying during *voir dire* to get onto a jury is an extraordinary and highly illegal act that completely undermines any trust that the juror will speak honestly or obey court orders. That is exactly what the juror in this case did. Even if the juror had been unwilling to disclose the specific relationship, the juror very easily could have more broadly acknowledged their inability to be an impartial juror in this matter and asked to be excused. Instead, the juror did the opposite.

The government became aware of this extraordinary irregularity in the case by the first day of trial. Specifically, the government was aware that the jury contained someone highly likely to be biased in favor of the government and willing to cover their tracks, becoming a de facto secret agent, a fifth column in the jury room. Rather than bring the issue immediately to the attention of the Court or defendant, it sat on the issue for the better part of two days, while the jury remained empaneled.[1]

When the government did eventually bring the issue to the attention of the Court and the defendant, the Court effectively closed the courtroom, not only to the public, but to the defendant as well, compounding the appearance of irregularity. District of Connecticut Local Rule 5(e)(1)(b) permits such action without prior notice to the public only under "extraordinary circumstances."

---

[1] There was some discussion on the fourth day of trial concerning this timeline (Doc. 215 at 7):

THE COURT: I don't think it was two days after the government was aware of the issue, Mr. Maguire. I think he found out about it, and the Court -- we were in Court the next day.

MR. MAGUIRE: I believe the government represented they discovered it on Wednesday, and we -- we -- the defense learned about it Thursday night, and it was addressed in Court on Friday.

THE COURT: All right. The record is what the record is.

14

While the court (without consulting Defendant) found such exceptional circumstances existed, the only apparent reason that the sealed discussion happened in the manner and time it did was due to decisions by the government concerning when and how to provide this disclosure. This was not a situation in which a situation arose unexpectedly or where emergent events beyond the control of any party compelled quick action. The *content* of the material being sealed may well have been extraordinary, but the *circumstances* of the disclosure were remarkable only for the substantial delay—entirely within the control of the government—that preceded it.

Despite Defendant's request, the Court refused to further canvas the jury as to whether the tainted juror had, despite his protestations to the contrary, discussed the case or otherwise influenced the remaining jurors. The court's apparent faith in the integrity of the dismissed juror and dismissal of Defendant's concern that he may have lied to the Court about discussing the case as "unfounded" is at decided odd with the Second Circuit's contrary ruling in *Colombo* that a juror's duplicity during *voir dire* is inconsistent with the notion that the juror would later be honest or obey the Court's other rules.

Rule 33 broadly provides a mechanism for the Court to order a new trial whenever "the interest of justice so requires." "By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992), and as a broad standard "[i]t is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous." *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). Put otherwise, "[t]he generic 'interest of justice' language in Rule 33's text, at least at first glance, would appear to permit the grant of a new trial on the basis of perceived unfairness of less than reversible magnitude." *United States v. Munoz*, 605 F.3d 359, 374 (6th Cir. 2010).

From the perspective of a member of the public, these circumstances, to put it simply, look very bad. A person with a direct and ongoing relationship with the FBI intentionally lied to the Court to get on the jury. The government learned of the deception and of the person's relationship to the FBI—then sat on the information from at least Wednesday afternoon through Thursday. The Court in turn heard secret evidence from the chief of the criminal division of the United States Attorney's office, closing the courtroom without any notice to the public using a procedure reserved for extraordinary circumstances. And then, relying on reasoning contrary to established Second Circuit precedent, the Court held that these developments raised so little concern that there was no need to canvas the jury to determine what, if any, prejudice had resulted from the tainted juror's presence over two full days of evidence.

The secret nature of the jury room, and the secrecy veiling some of the government's statements regarding the tainted juror, make it difficult to point precisely to the consequences of what happened in the jury room while the tainted juror was present. What IS publicly known, however, fractures any presumption that all was well in the jury room during those two days. The secrecy and opacity of the official response to this juror misconduct only contributed to what became a toxic cloud of secrecy. And the failure to question the remaining jurors to dispel this miasmic haze leaves in place at least at perception of unfairness and irregularity inconsistent with the appearance of due process. The Court, parties, and public are left with only the word of a liar that they did deliberately compromise Mr. Chambers' Fifth and Sixth Amendment rights to due process and a fair trial. With a man's liberty at stake, that state of affairs is unacceptable.

> ### C.   Prosecutorial Misconduct in Closing Affected the Verdict.
>
> #### 1.   *The government distorted the record in its closing.*

"The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998). Here, the government did precisely that, and at multiple points. Defense counsel, for example, contemporaneously objected to the government's statement regarding the Eblens robbery

that "There was some suggestion just now that he wouldn't have called Mr. Brown if he knew that there was a police officer with a yellow vest on. Go back and look at the transcript. The police officer testified that he had just set up when Mr. Brown came running out." Doc. 219 at 166. In fact, the officer testified that he had "gotten there maybe 10, 15 minutes prior" to the robbery, Doc. 215 at 181—long before surveillance showed Mr. Chambers in the store. The government offered this misstatement in an attempt to rebut Defendant's explanation that a person aiding a robbery would not logically be expected to tell the robber the coast was clear when a police officer was in plain view outside the front door of the building.

The government then went on both to mischaracterize the record and disparage Mr. Chambers in commenting that "I would suggest that the credible evidence here demonstrates that Mr. Chambers was the one -- the master, the puppeteer behind these robberies. He sent out his brother to commit them." Doc. 219 at 168. The government, however, had offered no evidence at all of the contents of Mr. Chambers' interactions with Mr. Brown that would suggest such a relationship, nor did the government provide evidence that Mr. Chambers profited at all from the robberies, let alone that he took the lion's share as the "master." There is good reason why the government did not charge a conspiracy in this case: there is simply no evidence showing what the government claims.

The government also intentionally chose inflammatory terms—"master" and "puppeteer"— to falsely characterize Mr. Chambers, relying on the emotional force of the words rather than their (absent) factual accuracy. This was not appropriate. *Cf. United States v. Natal*, No. 3:12CR164 JBA, 2014 WL 3881988, at \*20 (D. Conn. Aug. 7, 2014), o*rder vacated in part on reconsideration,* No. 3:12-CR-164 JBA, 2014 WL 5361469 (D. Conn. Oct. 21, 2014), *and vacated in part on other grounds,* 849 F.3d 530 (2d Cir. 2017) (asking the rhetorical question "who does that" in an attempt to demonize [defendant] . . . when viewed together with the government's later comments that Mr. Natal sounded

17

"menacing and soulless," and describing his conduct . . . as disingenuous and scheming . . . crossed the line of permissible argument"). What's more, the government's resort to emotionally charged ad hominem attack was precisely on the issue central to this case: the question of Mr. Chambers' mental state.

   2. *The government improperly burden-shifted by suggesting defendant failed to produce evidence.*

The Second Circuit has held that "[a] prosecutor's commentary about a defendant's lack of evidence becomes prejudicial only if the jury would naturally and necessarily interpret the Government's summation as a comment on the defendant's failure to testify or if the evidence that the defendant has not produced was exclusively in his control." *United States v. Daugerdas*, 837 F.3d 212, 227 (2d Cir. 2016) (internal quotation marks omitted). Here, the government's commentary did precisely that, inviting the jurors to question why the defendant did not put on evidence or take the stand.

No fewer than six times in its rebuttal closing, the government used the phrase "no evidence." First, the government claimed that "the fact that Mr. Chambers' brother may live in the direction of Avenue Cafe or Bishop's Corner does not matter. There's no evidence they ever went to his brother's house." Doc. 219 at 162. Evidence relating to Mr. Chambers' close relative is precisely the sort of information the jury would expect Mr. Chambers to have sole ready access to, leading the jury to wonder why Mr. Chambers did not put on his brother to testify.

In a thematic series of reiterated claims, the government also repeatedly remarked that "There was no evidence that Mr. Brown ever worked in Nikita's. There was no evidence that he had any idea of how the establishment worked," Doc. 219 at 169, that there was "no evidence that [Mr. Brown] had any connection with Little Caesars," Doc. 219 at 169, and "[t]here is no evidence that Mr. Brown

18

had any independent connection to either Avenue Cafe or Bishop's Corner." Doc. 219 at 173. The evidence in this case indicated that Mr. Chambers and Mr. Brown were brothers, giving Mr. Chambers privileged insight into his close relative's life and doings. Why, the jury was left to wonder, did Mr. Chambers not step forward to explain his brother to them?

**D.      The Weight of the Evidence is Against the Jury's Verdict.**

The government's proof is legally insufficient for the reasons outlined in Mr. Chambers' Rule 29 motion, even weighing the evidence in the light most favorable to them and drawing every rational inference in their favor. In making that determination, of course, the Court is not permitted to serve as a 13th juror.

However, in reviewing a motion for a new trial, the Court can act as a 13th juror and grant a new trial to prevent a miscarriage of justice. Here, where much of the scant evidence concerning Mr. Chambers' mental state came from witnesses with significant biases or motives to implicate Mr. Chambers—including Shemika Smith, who was fired in apparent connection with the Nikita's robbery, and Nicole Pariseau, whose intimate relationship with Mr. Chambers had soured—the Court should exercise its discretion and grant a new trial.

**CONCLUSION**

For the reasons above the Court should, if it does not enter judgments of acquittal as to all counts in this matter, grant a new trial as to each count.

Respectfully submitted,

THE DEFENDANT,
Eric Chambers

OFFICE OF THE FEDERAL DEFENDER

Dated: July 12, 2019                    /s/ James P. Maguire
                                        James P. Maguire
                                        Assistant Federal Defender
                                        265 Church Street, Suite 702
                                        New Haven, CT 06510
                                        Phone: (203) 498-4200
                                        Bar No.: ct29355
                                        Email: James_Maguire@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 12, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                        /s/ James P. Maguire
                                        James P. Maguire