# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:18-CR-00079 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC CHAMBERS | ) | FEBRUARY 13, 2020 |

## MEMORANDUM OF DECISION
### RE: MOTION FOR JUDGMENT OF ACQUITTAL [ECF NO. 177] AND MOTION FOR NEW TRIAL [ECF NO. 199]

Kari A. Dooley, United States District Judge

Following a jury trial, Eric Chambers ("Chambers") was found guilty of four counts of aiding and abetting Hobbs Act robbery, in violation of 18 U.S.C. §§ 2, 1951(a), and not guilty of two additional counts of aiding and abetting Hobbs Act robbery. Pending before the Court are the post-trial motions filed by Chambers pursuant to Rule 29 and Rule 33 of the Federal Rules of Criminal Procedure. Because of the interwoven nature of the arguments presented in these motions, the Court issues a single memorandum of decision. For the reasons set forth below, the post-trial motions are DENIED.[1]

## I. Background

On April 19, 2018, the grand jury returned an indictment against Chambers and his younger half-brother, Jachim Brown,[2] which contained multiple charges related to certain robberies that occurred in Connecticut in the fall of 2017. The operative indictment is the Second Superseding Indictment, which was returned on January 24, 2019. The Second Superseding Indictment contained six charges against Chambers:

---

[1] The motion for judgment of acquittal is found as moot as to Counts Four and Eleven of the Second Superseding Indictment, on which the jury returned a verdict of not guilty. The evidence presented and arguments raised as to these counts are not discussed further herein.

[2] Brown has changed him name to Ameer Edwards, and he was referred to by various names and nicknames during the trial. For the sake of consistency and simplicity, the Court refers to him exclusively as Brown.

- Count One charges Chambers with aiding and abetting Brown in the Hobbs Act robbery of Nikita's Bar on September 27, 2017 ("Nikita's robbery");

- Count Two charges Chambers with aiding and abetting Brown in the Hobbs Act robbery of Avenue Café on November 9, 2017 ("Avenue Café robbery");

- Count Four charges Chambers with aiding and abetting Brown in the attempted Hobbs Act robbery of Avenue Café on November 13, 2017;

- Count Six charges Chambers with aiding and abetting Brown in the attempted Hobbs Act robbery of BAR Restaurant on November 14, 2017 ("BAR robbery");

- Count Eight charges Chambers with aiding and abetting Brown in the Hobbs Act robbery of EbLens on November 16, 2017 ("EbLens robbery"); and

- Count Eleven charges Chambers with aiding and abetting Brown in the Hobbs Act robbery of Little Caesars Pizza on November 8, 2017.

On March 6, 2019, a jury trial commenced as to Chambers on the Second Superseding Indictment. On March 19, 2019, the jury returned a verdict of guilty as to Counts One, Two, Six, and Eight and a verdict of not guilty as to Counts Four and Eleven. A summary of the evidence presented with respect to the counts of conviction is set forth below.[3]

### A. Nikita's Robbery

Vincent Curcio testified that he manages four establishments in Connecticut, including Nikita's Bar ("Nikita's") and BAR Restaurant ("BAR"). (Tr. 3/6/2019 at 50.) He hired Chambers in April of 2017 to work as a security guard at Nikita's, a gentleman's club in Bridgeport. (Tr. 3/6/2019 at 52, 59, 62, 71; Gov't Ex. 4.)

For security purposes, Nikita's maintained two safes in a locked room at the back of the bar, a change safe and a "drop" safe. (Tr. 3/6/2019 at 56–57, 114–15.) The change safe always had $2,500 in it. (Tr. 3/6/2019 at 56, 58, 116.) When the safe exceeded that amount, the excess was dropped into the drop safe. (Tr. 3/6/2019 at 56.) As part of his duties as a security guard, Chambers was responsible for counting the money at closing and opening with the bartender. (Tr.

---

[3] This summary does not attempt to include all of the evidence which might have reasonably been relied upon by the jury in rendering its verdict.

3/6/2019 at 58, 113–14.)  After the closing count, the money would be secured in safes.  (Tr. 3/6/2019 at 58, 114–15.)  At opening, the security guard and the bartender would count the money again and place $200 in the cash register.  (Tr. 3/6/2019 at 56–58, 115–16.)  During his employment, Chambers was fined by Curcio because his money count was short.  (Tr. 3/6/2019 at 157, 167.)  Chambers was fired in either August or September of 2017.  (Tr. 3/6/2019 at 119 (late September); Tr. 3/8/2019 at 176–77 (August).)  He was not allowed to come to Nikita's afterward. (Tr. 3/6/2019 at 119.)

On September 27, 2017, the day of the robbery, Shemika Smith ("S. Smith"), a bartender, testified that she arrived for work at Nikita's around 10:00 a.m. and opened the bar at 11:00 a.m. (Tr. 3/6/2019 at 125.)  Shortly after opening, external surveillance footage shows Brown[4] walking toward Nikita's while wearing a mask, gloves, and a black sweatshirt with the hood up.  (Gov.'t Ex. 2-B.)  As Brown approached the entrance, Chambers' distinctive vehicle[5] is seen driving alongside Brown before passing him.  (Gov.'t Exs. 2-B, 2-C, 6, 7.)  The robbery was captured on Nikita's internal surveillance cameras.  The footage largely corroborated the account of the robbery provided by S. Smith.  Upon entering Nikita's, S. Smith testified that Brown demanded at gunpoint that she take him to the safe.  (Tr. 3/6/2019 at 126; Gov.'t Exs. 2-C, 2-D.)  When they reached the safe room, the door was locked, and S. Smith denied having a key.  (Tr. 3/6/2019 at 128.)  Brown accused her of lying and led her at gunpoint back to the bar where the key was located.  (Tr. 3/6/2019 at 128; Gov.'t Ex. 2-D.)  After retrieving the key and entering the safe room,

---

[4] Chambers did not dispute at trial that there was sufficient evidence to prove that Brown committed the underlying robberies for the counts of conviction.  Such was conceded by the defense during closing arguments.  For the sake of simplicity, therefore, the Court's recitation of the evidence refers to Brown as the perpetrator of all four robberies at issue.

[5] The evidence at trial established that Chambers drove a champagne-colored Nissan Maxima with a unique elongated sunroof that ran from front to back and a black sideview mirror on the driver's side.  (Tr. 3/6/2019 at 191, 236–37; Tr. 3/7/2019 at 87–88; Tr. 3/8/2019 at 189; Gov.'t Ex. 103–113 (photographs of Chambers' vehicle); Gov.'t Ex. 129.)

Brown ordered S. Smith to place the money in a bag that he brought with him, and S. Smith emptied the contents of the change safe into the bag. (Tr. 3/6/2019 at 129–30, 147; Gov.'t Ex. 2-E.) Brown then ordered S. Smith to stay in the safe room while he departed. (Tr. 3/6/2019 at 130; Gov.'t Exs. 2-F, 2-G, 2-H.)

Sometime after the robbery, Chambers spoke with Nicole Pariseau, a manager at BAR, about the robbery. (Tr. 3/8/2019 at 177–78.) He expressed concerns that people might suspect that he was involved, and Pariseau told him that he should not worry about it if he was not involved. (Tr. 3/8/2019 at 177–78.)

### B. Avenue Café Robbery

George Nacita testified that, on the night in question, he owned Avenue Café, a restaurant-bar, and Bishop's Corners, a strip club, in Bridgeport. (Tr. 3/7/2019 at 43–44.) He testified that both establishments closed at 1:00 a.m. (Tr. 3/7/2019 at 45–46.) After closing, the money from Avenue Café was placed in the safe at Bishop's Corner. (Tr. 3/7/2019 at 51.) Nacita did not know Chambers or Brown, but two of his employees, Ruben Davis and Frank Bell, were familiar with them. (Tr. 3/7/2019 at 56, 85–87; Tr. 3/8/2019 at 48–49, 54–55.)

Davis, who was responsible for transporting money from Avenue Café to Bishop's Corner at the end of the night, knew Chambers from when Chambers worked at another bar across the street from Avenue Café. (Tr. 3/7/2019 at 87.) He also knew Brown, who was in a relationship with the mother of his (Davis') child. (Tr. 3/7/2019 at 85–86, 100, 102; Gov.'t Ex. 26-B.) Bell was the head of security at Bishop's Corner. (Tr. 3/8/2019 at 48.) He met Chambers through his father (Hakeem), who worked at Bishop's Corner until Hakeem was fired a few months before the robbery. (Tr. 3/8/2019 at 51–52.) Bell testified that Chambers was a regular at Bishop's Corner in 2017, even after his father's firing, and he often stayed until after closing. (Tr. 3/8/2019 at 49–

50, 52.) Bell knew that Hakeem had a second son, Brown, and he recalls seeing Chambers and Brown together at another bar in 2017. (Tr. 3/8/2019 at 54–55.)

On November 9, 2017, at approximately 1:06 a.m., Davis was robbed as he arrived at Bishop's Corner to make the nightly deposit from Avenue Café. (Tr. 3/7/2019 at 93; Tr. 3/8/2019 at 53–54; Gov't Ex. 25-A.) External surveillance footage shows Chambers' vehicle, which had its headlights off, following Davis' vehicle as he approached the rear entrance of Bishop's Corner. (Gov't Ex. 25-A.) After pausing along the side of the road as Davis parked, the headlights on Chambers' vehicle turn on, and the vehicle drives off-camera. (Gov't Ex. 25-A.) Moments later, Brown, who was armed and wearing a mask, hooded sweatshirt and gloves, approaches Davis from the direction Chambers' vehicle had driven. (Gov't Ex. 25-A; Tr. 3/7/2019 at 93–94.) After the robbery, Brown fled back in the direction from which he came. (Gov't Ex. 25-A.) Davis testified that he remembered seeing Chambers' vehicle in the area of the back entrance of Bishop's Corner the night he was robbed. (Tr. 3/7/2019 at 103–04.) It is unclear from his testimony whether he saw the vehicle before or after the robbery. The evidence properly construed supports the inference that Davis saw Chambers' vehicle after the robbery when Brown was fleeing. (*See* Gov't Ex. 25-A.)

Special Agent James Wines of the Federal Bureau of Investigations ("SA Wines"), who was qualified as an expert in historical cell site analysis, testified about his analysis of Chambers' cell phone records and the cell site location data contained therein for the night of the Avenue Café robbery. (Tr. 3/14/2019 at 127.) Chambers' cell phone records revealed that on the night of the robbery he received a call at 12:29 a.m., which terminated at 12:55 a.m. (Gov't Ex. 99 at 4; Gov't Ex. 117 at 8.) The phone call originated and terminated on two different cell sites, which were over two miles apart "as the crow flies." (Tr. 3/14/2019 at 142–43, 146; Gov't Ex. 99 at 4; Gov't

Ex. 117 at 8.)  Based on the distance between the originating and terminating cell site and the length of the call, SA Wines opined that it was consistent with Chambers' cell phone moving from the south end of Bridgeport to the Boston Avenue/Mill Hill area of Bridgeport during the call.  (Tr. 3/14/2019 at 145.)  SA Wines also testified that if someone were to place a call from Bishop's Corner, he would expect the cell phone to utilize the terminating cell site and cell sector being discussed.  (Tr. 3/14/2019 at 146–47.)

### C.  BAR Robbery

Several witnesses testified that payroll for the four establishments managed by Curcio, including Nikita's, was left in envelopes with the on-duty bartender at BAR for pickup on Tuesdays between 6:00 p.m. and 8:00 p.m.  (Tr. 3/6/2019 at 73–74, 123–24; Tr. 3/8/2019 at 174–75, 181, 169, 201, 217.)  Pariseau testified that she would normally wait for payroll to arrive and then leave afterwards.  (Tr. 3/8/2019 at 175–76.)  She further explained that she normally drove to work, and Chambers was familiar with her vehicle.  (Tr. 3/8/2019 at 176.)

Reginald Woodard worked as a bartender at BAR and knows Chambers.  (Tr. 3/8/2019 at 217–18.)  Woodard testified that the Saturday before the robbery, November 11, 2017, Chambers came to BAR.  (Tr. 3/8/2019 at 218–19.)  Woodard recalled that Chambers sat at the corner of the bar in a position where he had full view of the area behind the bar.  (Tr. 3/8/2019 at 219–21.)  Woodard explained that Chambers normally would not talk much with him when he came to BAR, but that Saturday Chambers stayed longer and was more talkative than usual.  (Tr. 3/8/2019 at 218–19, 221–23.)  Their conversation was mostly "street-oriented," but Chambers did talk about the Nikita's robbery.  (Tr. 3/8/2019 at 223.)  In light of the events that followed, Woodard testified that he found the encounter with Chambers to be suspicious and drew a connection between it and the subsequent robbery.  (Tr. 3/8/2019 at 222–23.)

On the night of the BAR robbery, Tuesday, November 14, 2017, Woodard was the on-duty bartender. (Tr. 3/8/2019 at 180, 223.) Pariseau was at BAR waiting for payroll to arrive, but her vehicle was not in the parking lot because it was being repaired. (Tr. 3/8/2019 at 179–80.) External video surveillance footage shows Chambers' vehicle pulling into a parking lot across from the rear parking lot for the Lovell building, where BAR was located, shortly before the robbery. (Gov.'t Ex. 56-C.) For almost a minute, the vehicle idled near the exit, facing the Lovell parking lot.[6] (Gov.'t Ex. 56-C.) The vehicle then drove into the Lovell parking lot where Brown exited. (Gov.'t Ex. 56-D.) Brown initially walked toward the rear door of BAR before walking back, and the Government posited at trial that he had discovered that the back door to BAR was locked. (Gov't Ex. 56-D; Gov't Ex. 56-E.)

Shortly thereafter, Brown entered BAR through the front entrance while holding a cell phone to his ear. (Gov.'t Ex. 56-F.) Brown pulled out a firearm as he approached Woodard and Pariseau, who were at the bar. (Gov.'t Ex. 56-F.) Woodard testified that it looked like Brown was talking to someone on the phone, but he could not make out what was being said. (Tr. 3/8/2019 at 224–25.) When Brown approached, he told them that he was "not playing," and Pariseau told Woodard to do whatever Brown asked. (Tr. 3/8/2019 at 181–83.) Brown moved behind the bar with Woodard while still brandishing his firearm and holding the cell phone to his ear. (Gov.'t Ex. 56-F.) When Woodard moved to open the cash register for Brown, Brown directed Woodard to move away from the register and picked up a basket underneath it instead. (Gov.'t Ex. 56-F; Tr. 3/8/2019 at 183–84.) Pariseau testified that payroll was delivered in a stack of envelopes, which was normally kept near the register. (Tr. 3/8/2019 at 202.) But, on the night of the robbery,

---

[6] The Government asked the jury to infer that Chambers was checking to see if Pariseau's vehicle was present, which, if it were not, would normally mean that the payroll had been delivered to BAR.

payroll had not arrived yet, and the basket that Brown took was full of office supplies, including envelopes. (Tr. 3/8/2019 at 181, 203).

As Brown picked up the basket, he put down his cell phone from his ear for the first time. (Gov.'t Ex. 56-F.) As Brown moved out from behind the bar with the basket, he passed Woodard and shot him. (Gov.'t Ex. 56-F.) In response Woodard ran out of the front door while Brown ran out of the back door. (Tr. 3/8/2019 at 184–85, 231–32; Gov't Ex. 56-D; Gov.'t Ex. 56-E.) After confirming that the robber had left, Pariseau grabbed her cell phone and went to look for Woodard. (Tr. 3/8/2019 at 185–86.) As she left BAR, she called 911. (Tr. 3/8/2019 at 186.) The parties stipulated that Pariseau called 911 at 6:58 p.m. (Gov.'t Ex. 127.) Pariseau eventually found Woodard, who had collapsed in the parking lot. (Tr. 3/8/2019 at 186.)

Later that night, at 12:38 a.m., Chambers sent the following text message to Pariseau:

> Just got back in town sonebody [sic] said someone got shot in bar is you okay what happened[.]

(Gov.'t Ex. 55-B.) Pariseau thought it was suspicious that Chambers' message led with "just got back in town" because, although many people reached out after the robbery, nobody else mentioned where they were at or what they were doing during the robbery. (Tr. 3/8/2019 at 192.) Pariseau also testified that she had previously been romantically involved with Chambers but had broken off the relationship. (Tr. 3/8/2019 at 213.) Accordingly, at the time of the robbery, Pariseau testified that she and Chambers were not speaking frequently; (Tr. 3/8/2019 at 209); which was corroborated by other evidence that Pariseau was largely non-responsive to Chambers' efforts to communicate with her in the weeks leading up to the BAR robbery; (Def.'s Ex. 518).

Investigators later seized Brown's two cell phones. A review of the call log from one of those phones and Chambers' cell phone records revealed that Brown called Chambers at 6:54 p.m. the night of the BAR robbery and remained on the phone with him until 6:56 p.m. (Gov.'t Ex. 83

at 5; Gov.'t Ex. 99 at 30; *see also* Tr. 3/8/2019 at 104–05.)  The extraction reports for both of Brown's cell phones do not reveal any calls with anyone other than Chambers on the day of the BAR robbery.  (Gov.'t Exs. 83, 84.)

SA Wines testified about the general location of Chambers' cell phone on the night of the BAR robbery.  SA Wines testified that Chambers' cell phone was not active outside of the Bridgeport or Stratford area that day.  (Tr. 3/14/2019 at 152.)  SA Wines further opined that if someone were to make a call from BAR, he would expect the cell phone to use either Sector 2 or Sector 3 of Tower 610.  (Tr. 3/14/2019 at 150–51.)  SA Wines testified that Chambers' cell phone used Tower 610, Sector 3, twice on November 14, 2019—once to receive an incoming call at 6:54 p.m. and once to make an outgoing call at 6:59 p.m.  (Tr. 3/14/2019 at 150.)  Both parties attempted to elicit an opinion concerning the significance of the second call terminating at 7:00 p.m. on Tower 721.  During his testimony, SA Wines was generally reluctant to determine movement based on a change in cell sites when the call was of short duration.  (*See* Tr. 3/14/2019 at 173–75.)  But he agreed that a phone might use Tower 721 if the caller was driving south on Interstate 95 or in the area of the on-ramp to Interstate 95 that was located about "1,200 feet from the area of BAR-Stratford."  (Tr. 3/14/2019 at 155, 182, 200.)

### D.  EbLens Robbery

On the morning of November 16, 2017, Ateelah Boyd and Kyana Smith ("K. Smith") arrived for work at EbLens, a shoe and apparel store, in Bridgeport.  (Tr. 3/12/2019 at 119–21, 135–36.)  Boyd was working near the cash register, while K. Smith was in the backroom handling a shipment and paperwork.  (Tr. 3/12/2019 at 122, 136–37.)  They opened the store to the public at 9:27 a.m.  (Gov.'t Ex. 67-B.)

Around 9:24 a.m., Chambers parked on Chestnut Street, a side street near the shopping center where EbLens is located, even though it was raining and the shopping center has a parking

lot.  (Gov't Ex. 65-F; Tr. 3/14/2019 at 21–22; Tr. 3/12/2019 at 162; Gov't Ex. 79.)  After parking, Chambers walked to EbLens while Brown waited in the running vehicle.  (Gov't Ex. 65-F.) Chambers entered EbLens at 9:28 a.m.  (Gov't Ex. 67-B.)  Surveillance footage shows Chambers walking around the store and speaking with someone outside of view.  (Gov't Ex. 67-C.)  Boyd, who did not have an independent recollection of this encounter, testified while reviewing the surveillance footage that Chambers could have been talking to either her or K. Smith based on his location in the store.  (Tr. 3/12/2019 at 147, 152–53.)  Surveillance footage shows Chambers looking back and forth between the direction of Boyd and K. Smith during this exchange.  (Gov't Ex. 67-C.)  Chambers exited the store at 9:29 a.m. without purchasing anything.  (Gov't Ex. 67-D; Tr. 3/12/2019 at 147.)

Chambers' cell phone records reveal that less than a minute after leaving EbLens he placed a call to Brown, which lasted for 23 seconds.  (Gov't Ex. 99 at 35.)  Surveillance footage shows Brown exiting Chambers' vehicle at 9:30 a.m.  (Gov't Ex. 65-F.)  At 9:31 a.m., Chambers received an incoming call from Brown, which lasted 13 seconds.  (Gov't Ex. 99 at 35.)  Surveillance footage shows Chambers returning to his vehicle at 9:32 a.m., where he waited.  (Gov't Ex. 65-F.)

At 9:35 a.m., Brown entered EbLens while wearing a mask and hooded sweatshirt with the hood up.  (Gov't Ex. 67-E.)  After approaching Boyd at the register, Brown pulled out a firearm and pointed it at her and led her into the back room where K. Smith was.  (Gov't Ex. 67-F; Gov't Ex. 67-G.)  Upon seeing the robbery in progress, K. Smith was able to call 911 before Brown and Boyd arrived.  (Tr. 3/12/2019 at 148–50; Gov't Ex. 67-H.)  K. Smith then led Brown to the safe and put the money in a bag for him.  (Tr. 3/12/2019 at 150–51.)  After taking the money, Brown exited the store at 9:37 a.m.  (Gov't Ex. 67-H; Gov't Ex. 67-I.)

Officer Juan Esquilin testified that he was working near EbLens the morning of the robbery, overseeing utility pole work.  (Tr. 3/12/2019 at 161–62.)  Shortly after hearing a radio dispatch for an armed robbery at EbLens, Officer Esquilin saw Brown exit EbLens and pursued him as he ran back to Chestnut Street.  (Tr. 3/12/2019 at 163–69; Gov.'t Ex. 65-F.)  Surveillance and testimonial evidence established that Brown managed to open the front passenger door of Chambers' vehicle, but he shut the door and fled when he saw Officer Esquilin in close pursuit.  (Tr. 3/12/2019 at 169–70; Gov.'t Ex. 65-F.)  Shortly thereafter, law enforcement apprehended Brown.  (Tr. 3/12/2019 at 177–78.)

While Brown was in custody at the scene, Officer Dave Neary testified that he saw Brown moving around in the patrol car in a manner that made him concerned that Brown might have another weapon on his person other than the already seized firearm.  (Tr. 3/12/2019 at 226.)  When Officer Neary opened the door, he found Brown attempting to talk to someone on his cell phone.  (Tr. 3/12/2019 at 226.)  Officer Neary seized two cell phones from Brown.  (Tr. 3/12/2019 at 226.)  The data extraction from one of Brown's cell phones revealed that he had dialed 203-526-2559*7.  (Tr. 3/14/2019 at 90.)  The evidence also established that Chambers' cell phone number was 203-526-2559.  (Tr. 3/08/2019 at 179; Gov.'t Ex. 90; Gov.'t Ex. 91.)  Mark Spinella, an analyst with the Federal Bureau of Investigations ("FBI"), testified that *72 is a code used by telephone companies for call forwarding.  (Tr. 3/14/2019 at 111–12.)

Officers subsequently seized Chambers' cell phone.  An analysis of the phone revealed that all of Chambers' fifty-seven contacts with Brown between November 9, 2017 (the day of the Avenue Café robbery) and November 16, 2017 (the day of the EbLens robbery) had been deleted from the call log.  (Tr. 3/8/2019 at 120–21, 154; Tr. 3/14/2019 at 112.)

## II.    Pattern Evidence

Chambers asserts that it is axiomatic that "pattern evidence" cannot be considered by juries in multi-count trials.  This has bearing on Chambers motion for a judgment of acquittal because Chambers argues that pattern evidence cannot be considered when determining whether there is sufficient evidence to prove knowledge and specific intent as to each count of conviction.  He further argues in his motion for a new trial that the Court erred when it failed to instruct the jury that they could not consider pattern evidence.  Because Chambers' pattern evidence argument is integral to both post-trial motions, the Court takes up this issue first.

This argument has its genesis in a discussion that arose at the charge conference on March 13, 2019, the day before the close of evidence.  At that conference, Chambers requested for the first time that the jury be instructed that they must "evaluate the evidence with respect to each count separately."[7]  (Tr. 3/13/2019 at 30.)  The Government opposed this proposed instruction, arguing that while each count needed to be considered individually, the jury could properly consider evidence from the other charges for purposes of determining things like intent, modus operandi, or motive.  This issue was not resolved and thereafter the parties submitted briefing on the issue.  In that briefing, Chambers argued that in the ordinary course the government would have to provide a Rule 404(b) notice in order to have evidence from one count deemed admitted as to another count, as there was no conspiracy charged.  Because the Government failed to do so, and because the Court had not had an opportunity to consider the cross-admissibility of the evidence under Rule 404(b) or engage in Rule 403 balancing, Chambers urged that he would be

---

[7] Chambers did not file a motion to sever any of the counts prior to trial.  Neither party filed a motion *in limine* seeking confirmation of whether evidence from one robbery could be used as evidence of another robbery. Chambers further did not request any limiting instructions with respect to the evidence from each robbery as the trial progressed.  As a result, there was no occasion for the Court to address prior to the charge conference the extent to which evidence from one robbery could be used as proof of another robbery.

substantially prejudiced if the jury were permitted to draw inferences as to one count from evidence relating to a different count. The Government, in turn, urged that Rule 404(b) did not apply where, as here, the evidence as to each count was inextricably intertwined with another count and constitutes important proof of an element of the charged acts. The Government contended that evidence of the various robberies was particularly probative of Chambers' contention that he was an innocent bystander, rather than a knowing participant in Brown's criminal activity.

The following day, the Court ruled that it would not give the supplemental charge requested by Chambers. The Court noted at the outset that "the evidence as to all six robberies came in without restriction and for all purposes. And, obviously, built into that is all appropriate purposes." (Tr. 3/14/2019 at 228.) The Court agreed with the Government that other crimes evidence is directly admissible when the criminal activity at issue "arose out of the same transaction or series of transactions as the charged offense, . . . is inextricably intertwined with the evidence regarding the charged offense, or . . . is necessary to complete the story of the crime[s] on trial." (Tr. 3/14/2019 at 231 (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).) The Court found that robberies in this case were plausibly alleged to be part of a series and that, in many regards, evidence from one robbery was inextricably intertwined with evidence from another robbery or necessary to complete the investigative narrative of another robbery. Accordingly, evidence of one robbery was admissible as direct evidence of the other robberies and could be used by the jury as such. *See, e.g.*, *United States v. Needham*, 377 Fed. Appx. 84, 86 (2d Cir. 2010) (summary order) (concluding evidence of robbery outside of scope of charged conspiracy did not constitute other crimes evidence under Rule 404(b) where "involved four of the same participants as the other robberies and occurred within the same time-frame, plausibly arose out of the same series of transactions as the alleged conspiracy"); *United States v. Pizarro*, No. 17-cr-00151 (AJN),

2018 WL 1737236, at *5 (S.D.N.Y. Apr. 10, 2018) ("The evidence that Pizarro and a co-conspirator were allegedly able to obtain nearly $15,000 from an earlier robbery of Bishun at the Shop would be directly relevant to establish the Defendants' familiarity with Bishun and the Shop, and provide background for why they believed robbing him again would be lucrative.").

Subsequently during deliberations, the jury returned a note in which they, in essence, sought guidance concerning whether and to what extent evidence from each robbery was cross-admissible, as they perceived a "repetitive pattern." (Ct. Ex. 5.) In response to this note, Chambers again sought an instruction that evidence of one robbery could not be considered as evidence of a different robbery and further sought an instruction that the jurors "are not to consider pattern evidence in making their determination because that is, essentially, propensity evidence that's prohibited." (Tr. 3/19/2019 at 6.) As discussed *infra*, the Court denied this request in light of its earlier ruling that evidence of one robbery was directly admissible to prove another robbery, but the Court did admonish the jury again that they could not consider bad character or propensity evidence. Section IV.A., *infra* (discussing jury note and supplement charge given in response).)

Now, in his post-trial briefing, Chambers' argument has shifted to whether and to what extent a jury can consider so-called "pattern evidence" in multi-count trials. In advancing this argument, Chambers no longer equates pattern evidence with propensity evidence, as he did at trial. (*Cf.* Tr. 3/19/2019 at 6.) Instead, he asserts that "long-established and unequivocal" precedent establishes that "to cure the prejudice inherent in multiple-count trials, the jury cannot be permitted to use 'common sense' to draw conclusions from an apparent pattern formed by the relationship of separate counts." (Def.'s Rule 33 Mem. at 3, ECF No. 238.) Chambers acknowledged at the hearing on his motions that this argument presupposes that the jury could not use evidence from one robbery when deliberating on another robbery. Because the Court remains

of the view that the evidence of each robbery was properly admitted as direct evidence of the other robberies, Chambers argument regarding pattern evidence necessarily fails. Nonetheless, Chambers contention about the state of the law concerning pattern evidence warrants further discussion.

On this issue, Chambers relies principally on three cases: *United States v. Lotsch*, 102 F.2d 35 (2d Cir. 1939) (Hand, J.), *United States v. Halper*, 590 F.2d 422 (2d Cir. 1978), and *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994). Each of these cases is inapposite.

*Lotsch* and *Halper* are joinder cases in which the Second Circuit discussed the potential ills associated with multi-count trials. Neither of these cases discusses "pattern" evidence. Nor does either opinion express any concern about the jury drawing reasonable inferences from common features among several crimes when other crimes evidence had been properly admitted or evidence as to the multiple counts was deemed cross-admissible. Rather, the court's core concern was the risk that the jury would improperly use evidence that had been admitted as to only one count or improperly use the evidence of the multiple charges as bad character or propensity evidence. *See Lotsch*, 102 F.2d at 36 (expressing concern that multi-count trials may result in the jury using evidence admitted as to only one count when considering other counts and further convict the accused "because of his criminal disposition"); *Halper*, 590 F.2d at 430–31 (discussing that risks associated with joinder of counts of the "same or similar character" but recognizing that, "[d]espite these realities, joinder of offenses . . . of 'same or similar character' has been upheld where evidence of the one offense would be admissible in a separate trial on the other offense"). Chambers reliance on these and other joinder cases, therefore, is unavailing.

The third case relied upon by Chambers, *Tran Trong Cuong*, involved the prosecution of a physician for distributing by prescription controlled substances outside the usual course of medical

practice. There, the defendant was charged in 136 counts. *Tran Trong Cuong*, 18 F.3d at 1133. At trial, the government did not present any individualized proof concerning twenty of the patients, whose prescriptions made up eighty of the counts in the indictment. *Id*. at 1135. Instead, the government relied upon "the summary report of 33 patient files prepared and submitted by its medical expert and the testimony of the medical expert that the drug prescriptions contained in these files were made for other than legitimate medical purposes and beyond the bounds of medical practice." *Id*. at 1141. But the expert witness did not examine or interview any of these patients, and, during his testimony, he did not mention any of these twenty patients, he did not comment on the prescriptions they received, and "[n]o effort was made by the prosecution to focus his testimony on any of these 80 counts." *Id*. The defendant was ultimately convicted of 127 of the 136 counts. *Id*. at 1133.

On appeal, the Fourth Circuit concluded that there was insufficient evidence to sustain the defendant's convictions on the eighty counts for which no individualized proof was offered. In doing so, the court opined that this case was "a classic example of 'overkill' by the prosecution." *Id*. at 1142. By gratuitously charging 136 counts and presenting its case chiefly through an expert witness and a summary report, the government "invite[d] a jury to find guilt by association or as a result of a pattern, and to conclude that if the physician violated the Controlled Substances Act in those counts supported by the testimony of patient-witnesses as to their personal contact and conversations with the defendant, then the defendant must be guilty of the remaining counts." *Id*. The Fourth Circuit further observed that the expert witness himself had concluded that certain prescriptions were improper solely because they fit a perceived pattern across the defendant's files, not because the patient's medical records, or other individualized evidence, indicated that certain prescriptions were unwarranted. *Id.*

It is clear, therefore, that the Fourth Circuit's concern was not with "pattern evidence" as described by Chambers in his post-trial briefing. Rather it was with the government's reliance on what was essentially propensity evidence to prove the majority of the counts in the indictment— that is, the government asking the jury to conclude that the defendant improperly wrote prescriptions for the twenty non-testifying patients based solely on evidence that he improperly wrote prescriptions for other patients who testified or for whom there was individualized proof.[8] That is not the situation here. The Government presented individualized evidence as to each count in the indictment, and neither the Government nor its witnesses encouraged the jury, expressly or implicitly, to use the evidence for propensity purposes or to deliberate on the charges in a collective fashion. To the contrary, the Court instructed the jury, on two occasions, that it had to deliberate on each count separately and that it could not base its decision on any perceived propensity of Chambers to commit crimes or let its verdict on one count dictate its verdict on another count. Section IV.A., *infra*. Accordingly, *Tran Trong Cuong* has no more bearing on this case than *Lotsch* and *Halper*.

As the Court explained at trial, evidence of a defendant's participation in one robbery can be probative of and admissible to prove a defendant's participation in another robbery. *E.g.*, *Needham*, 377 Fed. Appx. at 86 (concluding evidence of robbery outside of scope of charged conspiracy was admissible as direct evidence where "involved four of the same participants as the other robberies and occurred within the same time-frame, plausibly arose out of the same series of

_____

[8] Chambers contends that the Government conceded in its post-trial briefing that pattern evidence was inadmissible at trial and should not have been considered by the jury. The Court disagrees. A fair reading of the Government's brief makes clear that the Government used the term "pattern" as it was used in *Tran Trong Cuong*, *i.e.*, propensity evidence. *See, e.g.*, Gov't Mem. at 48 ("Chambers' nonetheless relies on *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1141 (4th Cir. 1994) to argue that a conviction should not lie when based on a pattern. The Government has no quarrel with that proposition and, in fact, requested the instruction the Court provided on that very score."), ECF No. 214; *see also id.* (arguing that the split verdict "demonstrates that the jury was paying attention to the charge, and did not convict Chambers due to propensity or a pattern"). The Government confirmed as much at oral argument.

transactions as the alleged conspiracy"); *United States v. Chen Xiang*, No. 01-cr-00271 (RCC), 2003 WL 21180400, at *3 (S.D.N.Y. May 20, 2003) (holding that evidence regarding uncharged robberies was admissible where "[b]oth the charged and uncharged crimes are largely identical in plan and execution").

When evidence of one robbery has been admitted to prove another robbery, the trier of fact can draw inferences from patterns that might emerge across robberies. Indeed, courts have looked to this type of pattern evidence when evaluating sufficiency claims, including sufficiency claims raised in the context of multi-count robbery trials.[9] *E.g.*, *United States v. Perales*, 534 Fed. Appx. 502, 505 (6th Cir. 2013) (unpublished) (concluding that there was sufficient evidence to support conviction for Apple Creek robbery even though evidence was weak as to that count, because that robbery was committed in a nearly identical manner to two other robberies defendant was convicted of aiding and abetting); *United States v. Cobb*, 397 Fed. Appx. 128, 135 (6th Cir. 2010) (unpublished) (concluding that robbery for which there was stronger evidence of defendant's involvement supported conviction of robbery for which evidence was weaker where both robberies had similar *modus operandi*); *United States v. Thomas*, 627 F.3d 146, 156 (5th Cir. 2010) (agreeing that "[t]he government's evidence is weakest as to Thomas's convictions relating to the fourth bank robbery" but nonetheless concluding that there was sufficient evidence to support that

---

[9] Courts also frequently look to pattern evidence in prosecutions arising out of illegal financial transactions or tax offenses when determining whether knowledge, intent, or willfulness have been proven. *E.g., Holland v. United States*, 348 U.S. 121, 139 (1954) ("Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand."); *United States v. Libous*, 645 Fed. Appx. 78, 81–82 (2d Cir. 2016) (summary order) (stating that it was "permissible" for the district court, sitting as trier of fact, to consider the defendant's understatement of his income in the two tax years prior to the one at issue when determining whether there was sufficient evidence to establish willfulness in subsequent tax year); *United States v. MacPherson*, 424 F.3d 183, 192 (2d Cir. 2005) ("we conclude that it does not matter whether a structuring defendant's sufficiency challenge focuses on his knowledge of CTR filing requirements, his intent to evade these requirements, or . . . his knowledge that such evasion was illegal; . . . a reasonable jury may well be able to infer the necessary *mens rea* from the pattern of structured cash transactions"); *United States v. Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) ("Patterns of understating or failing to report income are also considered evidence of willfulness.").

conviction because "[t]he jury could reasonably infer that Hodges had the same partner in the first, second, third, and fifth bank robberies, and that he did not acquire a new partner for the fourth robbery who behaved identically to Thomas"); *see also United States v. Rivera Rodriguez*, 808 F.2d 886, 893–94 (1st Cir. 1986) ("In some instances, a pattern of criminality will support a finding of guilt beyond a reasonable doubt."); *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir. 1989) (concluding that there was insufficient evidence of knowledge where there was not "a pattern of acts or incriminating physical evidence reflecting the defendant's participation in a criminal scheme").

The reason consideration of pattern evidence, by the trier of fact or a reviewing court, is permissible is because:

> [i]nferences can . . . be drawn from pattern evidence. Where the government presents circumstantial evidence of an ongoing pattern of similar transactions, the jury may reasonably infer from the pattern itself that evidence otherwise susceptible of innocent interpretation is plausibly explained only as part of the pattern. In light of the pattern of dealing suggested by the government's evidence, a jury may reasonably conclude that the only plausible explanation of the evidence was the government's theory.

*Thomas*, 627 F.3d at 154–55 (citations omitted; internal quotation marks omitted).

Accordingly, because the evidence as to each robbery in this case was directly admissible at trial to prove the other robberies, the jury was permitted to draw reasonable inferences from any commonalities or patterns that they perceived across counts.

## III. Motion for Judgment of Acquittal

The Court next turns to the sufficiency arguments. Chambers moves for a judgment of acquittal on the grounds that the Government failed to prove beyond a reasonable doubt that he acted knowingly and with the requisite specific intent.

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citations omitted; ellipses omitted; internal quotation marks omitted).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Id*. "When making a case based on circumstantial evidence, the government need not exclude every reasonable hypothesis other than that of guilt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (citation omitted; internal quotation marks omitted).

With these legal principles in mind, the Court turns to the merits of Chambers' motion. "Under 18 U.S.C. § 2, a defendant may be convicted of aiding and abetting a given crime where the government proves that the underlying crime was committed by a person other than the defendant, that the defendant knew of the crime, and that the defendant acted with the intent to contribute to the success of the underlying crime." *United States v. Reifler*, 446 F.3d 65, 96 (2d Cir. 2006). Chambers' arguments focus on whether there is sufficient evidence to prove knowledge and specific intent. Generally, knowledge "may be inferred or gathered from the outward manifestations, by the words or acts of the party charged with knowledge and from the facts and circumstances surrounding or attendant upon the act with which it is charged to be connected. It may be proved by all the facts and circumstances disclosed by the evidence taken in connection with the case." *United States v. Nersesian*, 824 F.2d 1294, 1314 (2d Cir. 1987) (quoting *United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir. 1969)). "To prove that the defendant acted with . . . specific intent, the government must show that he knew of the crime, but it need not show that he knew all of the details of the crime, so long as the evidence shows that he joined the venture, that he shared in it, and that his efforts contributed towards its success." *Reifler*, 446 F.3d at 96 (alterations omitted; citations omitted; internal quotation marks omitted); *accord Rosemond v. United States*, 572 U.S. 65, 77 (2014) ("So for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission"). "A general suspicion or knowledge of illegality is not enough." *United States v. Wiley*, 846 F.2d 150, 154 (2d Cir. 1988) (alterations omitted; citation omitted; internal quotation marks omitted).

The nature and strength of the Government's evidence in this case varies from offense to offense, but there are certain common features. Surveillance footage, cell site evidence, or both

established that Chambers was present for each of the robberies, and, to varying degrees, the surveillance footage tended to establish that Chambers drove Brown to or from each of the robberies. The evidence further established that Chambers, unlike Brown, had a connection to or specialized knowledge of each of the establishments robbed. The manner in which robberies were committed, and the evidence of the close relationship between Chambers and Brown, supports the reasonable inference that Chambers conveyed this inside knowledge to Brown in order to facilitate the robberies. *Cf. United States v. Lloyd*, 631 Fed. Appx. 45, 48 (2d Cir. 2015) (summary order) ("Lloyd's knowledge and intent to rob the Wyandanch Post Office is evident from the fact that she conceived the crime and solicited her boyfriend to commit it. By providing information about the security and internal operations of the Post Office—information critical to success of the robbery—Lloyd took action manifesting her intent for the crime to succeed."). The Government further presented evidence that Chambers deleted evidence of his communications with Brown between November 9, 2017 and November 16, 2017 from his cell phone, which reasonably be construed as an effort by Chambers to hide his involvement in the Avenue Café, BAR, and EbLens robberies.

There is also evidence that is unique to each robbery that helps to establish knowledge and specific intent. Surveillance footage from the Avenue Café robbery shows Chambers' vehicle—with the headlights turned off—tailing Davis as he drove to Bishop's Corner to make the nightly safe deposit. This conduct is in and of itself suspicious and gives rise to the reasonable inference that Chambers was complicit in the robbery. Indeed, it was mere seconds between the time Chambers' vehicle drove off camera and when Brown appeared, from the same direction Chambers' vehicle had driven, wearing gloves and a mask and brandishing a firearm. From this, the jury might reasonably infer that Brown was gloved, masked, and armed while in Chambers'

vehicle, which is further evidence that Chambers was a knowing participant in the robbery. Considering this evidence in conjunction with the other evidence previously discussed, a jury could have reasonably concluded that the Government proved knowledge and specific intent beyond a reasonable doubt as to the Avenue Café robbery.

As to the BAR robbery, the evidence was stronger yet. The evidence established that Brown was on the phone with Chambers during the robbery.[10] It is reasonable to infer that during this call Brown sought and received assistance from Chambers, who, *inter alia*, was familiar with the layout of BAR and the payroll procedure. The text message to Pariseau, in which Chambers claimed to have returned from out-of-town, can also reasonably be construed as an effort to establish a false alibi for the night of the robbery, as cell site evidence established not only that Chambers' cell phone was in the general area of BAR at the time of the robbery but also that it was not otherwise active outside of the Bridgeport-Stratford area that day. In addition, there was evidence that Chambers conducted surveillance in furtherance of the robbery. Woodard testified that Chambers came to BAR the Saturday before the robbery, seated himself in a position where he could see the entire area behind the bar, was much more talkative than usual, and stayed longer than usual. Under the circumstances, the jury reasonably could have inferred that the purpose of this visit was to conduct reconnaissance for the upcoming robbery. Surveillance footage from the BAR robbery also shows Chambers idling in the parking lot across the street from the Lovell building in a manner that is inconsistent with someone innocently dropping off his brother without

---

[10] Relying on the time stamps from the surveillance footage from the BAR robbery, Chambers contends that he could not have been the person on the phone with Brown. But it was established at trial that the time stamps for the various surveillance cameras were not synced with real time or each other. An analysis of Brown's two phones revealed that the only person he called on the day of the BAR robbery was Chambers. In addition, Brown's phone revealed that he was on the phone with Chambers from 6:54 p.m. until 6:56 p.m. The parties stipulated that Pariseau called 911 at 6:58 p.m., and Pariseau testified that she placed that call only after confirming that the robber had left and as she went in search of Woodard. All of this evidence leads to the inescapable conclusion that Brown was on the phone with Chambers during the robbery.

knowledge of the robbery he is about to commit. Instead, this conduct supports the inference that Chambers was looking for Pariseau's vehicle, as Pariseau ordinarily left once payroll arrived. In short, the evidence as to the BAR robbery was sufficient to prove knowledge and specific intent beyond a reasonable doubt.

The same is true of the evidence for the EbLens robbery. Surveillance footage established that Chambers drove to EbLens with Brown and parked on Chestnut Street. In light of the fact that it was raining and the shopping center had a parking lot, the jury could have reasonably concluded that Chambers parked on Chestnut Street in order to avoid implicating his vehicle in the robbery. The surveillance and cell phone evidence presented at trial also supports the inference that Chambers went into EbLens to conduct reconnaissance for the robbery and that he called Brown immediately after he exited EbLens in order to share the information he learned about the store and the people inside with Brown, all for the specific purpose of contributing to the success of the robbery. Lastly, when Chambers returned to his vehicle on Chestnut Street, he waited for Brown with the engine running and left the scene when he saw that the police were pursuing Brown. The jury could have inferred from this conduct that Chambers was waiting for Brown to return with the robbery proceeds and that he immediately left the scene upon seeing the presence of law enforcement in order to avoid being apprehended or otherwise implicated in the robbery.[11]

---

[11] Chambers contends that a Hobbs Act robbery is complete once a taking has occurred and, therefore, any aid rendered during the so-called "escape phase" of a robbery cannot provide a basis for a conviction. As an initial matter, the Court is not persuaded that federal precedent supports this argument. *United States v. Zayac*, 765 F.3d 112, 122 (2d Cir. 2014) ("a robbery involves both a taking and a carrying away, so that the escape phase of a crime is not . . . an event occurring after the robbery but *is part of the robbery*." [citation omitted; internal quotation marks omitted]); *United States v. James*, 998 F.2d 74, 80 (2d Cir. 1993) ("There is ample authority from other circuits for the proposition that one who assists in the escape phase of a bank robbery is an aider and abettor of that robbery, and not an accessory after the fact."); *United States v. Barlow*, 470 F.2d 1245, 1253–54 (D.C. Cir. 1972) (holding that an individual whose actions are designed to assist the principal in the continuing asportation of the fruits of a larceny is properly charged as an aider and abettor rather than an accessory after the fact). Even if the Court were to accept Chambers' argument, however, the evidence concerning Chambers' pre-taking conduct is sufficient to support his conviction for aiding and abetting the EbLens robbery.

Lastly, the Nikita's robbery. The evidence as to this robbery was certainly the weakest. There is no cell phone or cell site evidence for this robbery, and Chambers' vehicle is seen only briefly on surveillance footage. Nonetheless, the suggestion that Chambers' vehicle was innocently driving by the masked, gloved, and armed Brown as he entered Nikita's is in and of itself dubious under the circumstances. The evidence also included Chambers' motive to rob Nikita's—his then-recent firing. Chambers' complicity in the robbery can also be inferred from Brown's apparent knowledge about the safe and, albeit to a lesser degree, Chambers' efforts to distance himself from the robbery when speaking with Pariseau. Add to this matrix evidence of Chambers' involvement in the later robberies, all of which had similar distinguishing characteristics to the Nikita's robbery, a jury reasonably could have concluded that the only plausible explanation for the presence of Chambers' vehicle was that Chambers was as complicit in the Nikita's robbery as he was in the other robberies. *Cf. United States v. Thomas*, 627 F.3d 146, 156 (5th Cir. 2010) (concluding that evidence of defendant's and his brother's involvement in the first, second, third, and fifth bank robberies supported conviction for fourth robbery where the robberies were committed in the same manner); *see also United States v. Lugo Guerrero*, 524 F.3d 5, 14 (1st Cir. 2008) (noting in the context of an evidentiary claim that evidence of defendant's participation in two prior armed bank robberies "makes it unlikely that his presence in the [getaway] vehicle [with the two robbers] was a mere coincidence").[12]

---

[12] In support of his motion, Chambers also relies upon several cases in which the Second Circuit reversed conspiracy and aiding and abetting convictions because the defendant played a subordinate role in the criminal conduct charged and plausibly could have fulfilled that role without knowing the scheme's criminal nature. *See generally United States v. Davis*, 690 F.3d 127, 131–32 (2d. Cir. 2012) (collecting and discussing cases). "That is, it [was] conceivable that the criminal enterprises at issue could have functioned as planned without the requisite criminal knowledge of the taxi driver (*Ogando*), the money transferor (*Lorenzo*), the lookout (*Rodriguez*), the frequent caller and gun supplier (*Friedman*), and the driver and box loader (*Samaria*)." *Id*. These cases are distinguishable because, as discussed above, the jury could have reasonably concluded from the evidence that Chambers had the "requisite criminal knowledge" and intent with respect to each count of conviction.

For these reasons, the Court concludes that there was sufficient evidence to prove knowledge and specific intent as to each count of conviction. Chambers' motion for judgment of acquittal is denied.

## IV. Motion for a New Trial

Chambers moves for a new trial on several grounds: (1) the Court's instruction in response to a jury note caused the jury to consider the charges and the evidence in a collective or cumulative fashion; (2) the events surrounding the dismissal of Juror 18 potentially tainted the jury and created an appearance of injustice; and (3) prosecutorial misconduct by the Government during closing argument deprived him of a fair trial.[13] The Government contests each claim of error.

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "In other words, there

---

[13] Chambers also argues, with little analysis, that the verdict was against the weight of the evidence. A weight claim does not challenge the legal sufficiency of the government's evidence but rather it asserts that the government's evidence was so flimsy as to raise a substantial question regarding the reliability of the jury's verdict and whether a serious miscarriage of justice has occurred. *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982); *see also State v. Griffin*, 253 Conn. 195, 200–201 (2000); LaFave, et al., 6 Crim. Proc. § 24.6(d) (4th ed.); Wright & Miller, 3 Fed. Prac. & Proc. Crim. § 582 (4th ed.). The Court is not persuaded that permitting the guilty verdicts in this case to stand would result in a miscarriage of justice and, therefore, this argument is unavailing. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (setting forth standard for weight claims).

must be a real concern that an innocent person may have been convicted" for the ordering of a new

trial to be appropriate. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (alteration omitted;

citation omitted; internal quotation marks omitted).

### A. Supplemental Jury Instruction

Chambers argues that the supplemental instruction given in response to a jury note caused

the jury to consider all counts and the associated evidence collectively, rather than on a count-by-

count basis. The Government responds that the jury was adequately advised of the need to consider

each count separately, that the Court's instruction that some evidence might have bearing on

multiple robberies was appropriate, and that it would have been improper for the Court to highlight

for the jury what evidence should be considered across counts. The Court is not persuaded that its

supplemental instruction misled the jury and, therefore, a new trial is not warranted.

Prior to deliberations, the Court instructed the jury that they needed to consider each count

separately, that they should not let their verdict on one count dictate their verdict on another count,

that their verdict should not be based on bad character or propensity evidence, and that Chambers

could be found guilty of one count and not guilty of another count. On the second day of

deliberations, March 19, 2019, the jury returned the following note:

> Do we look at each offense as separate events, or through, common
> sense can we use info from other offenses and apply to each ~~ea~~
> offense. As an example, if his car appears at more than 1 event can
> we use that info during our deliberations?
>
> We ask because there is a repetitive pattern yet we want to judge
> each ~~account~~ count sep[ara]tely?

(Ct. Ex. 5; *see also* Tr. 3/19/2019 at 2–3.) In response to that note, Chambers asked the Court to

instruct the jury, *inter alia*, that they could not consider evidence from one count as proof of

another count and that they could not consider pattern evidence. The Government disagreed and,

instead, proposed reminding the jury that they cannot consider propensity evidence and that they

needed to deliberate on each count separately. After discussing the issue further with counsel, the Court modified one of its original instructions and re-instructed the jury as follows (modifications to the original charge are emphasized):

> Mr. Chambers has been charged with six offenses. The number of charges is not evidence of guilt and should not influence your decision in any way. You must consider each count separately and return a separate verdict of not guilty or guilty for each count. Whether you find Mr. Chambers not guilty or guilty of one count should not dictate your verdict regarding any other count**; *however, there may be evidence that you find, within the parameters of my instruction, that goes to one or more of the robberies. Such evidence may be considered by you with respect to these robberies; however,*** you must not find Mr. Chambers guilty of one count simply because you may have found him guilty of another count.
>
> ***With respect to your inquiry regarding a perceived pattern***, you must not base your verdict on any perception that you may have that Mr. Chambers is of bad character or has a propensity to commit crimes.

(Tr. 3/19/2019 at 19–20 (emphasis added); *cf.* Tr. 3/15/2019 at 60–61.)

The Court did not, as urged by Chambers, instruct the jury that they could deliberate on all counts in a collective fashion. The Court's instructions clearly and unequivocally informed the jury that they needed to deliberate separately on each count. As a general matter, "juries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *see also United States v. Stewart*, 433 F.3d 273, 307 (2d Cir. 2006) (noting "the well-settled proposition that jurors are presumed to follow instructions"). In addition, the substance of the jury note and the split verdict further support the conclusion that the jury understood the need to deliberate on each count separately.

Chambers also argues that supplemental jury instruction was deficient because it did not inform the jury that they could not consider pattern evidence and that they had to consider the evidence as to each robbery in isolation. As the Court previously explained, evidence from one

robbery was directly admissible to prove the other robberies in this case, and the jury was therefore permitted to draw reasonable inferences from commonalities among the robberies. *See* Section II., *supra*. Accordingly, the failure of the Court to instruct the jury to the contrary does not provide a basis for granting a new trial.

### B. Dismissal of Juror 18

Chambers next argues that he is entitled to a new trial because Juror 18 might have "tainted the entire jury" and the circumstance surrounding his dismissal created an "appearance of injustice." (Def.'s Rule 33 Mem. at 1, 12–13.) The Government responds that the dismissal of Juror 18 was necessary to ensure that Chambers had a fair trial and that the process by which he was dismissed did not create an appearance of impropriety. The Court agrees with the Government.

In the afternoon of March 6, 2019, the United States Attorney's Office learned that Juror 18 had an on-going professional relationship with a retired FBI agent, who currently worked in the United States Attorney's Office, and had met with other FBI agents. The retired agent had no relationship to or involvement in Chambers' case, and Juror 18 did not discuss the substance of Chambers' case or trial with the retired agent. Upon learning this information, the Chief of the Criminal Division of the United States Attorney's Office instructed his office, the retired FBI agent, and other members of the FBI not to have any further contact with Juror 18, and he began collecting additional information regarding this relationship. On the evening of March 7, 2019, trial counsel for the Government alerted the Court and defense counsel that it had information about one of the jurors that it would like to bring to the Court's attention.

The following morning, March 8, 2019, the Court convened a hearing, as requested. The Government explained the nature of the relationship at issue, how and when the Government came

to learn of it, and the precautionary steps it had undertaken in response.[14]   Although the

Government was reluctant to provide specific details concerning the relationship on the public

record, it repeatedly stated that it was willing to provide more details on an *ex parte* basis.   Based

on the Government's representations on the public record, the Court concluded that there was a

basis for dismissing Juror 18 for cause.   Chambers indicated that he did not consent to the

dismissal.   When the Court inquired as to why, defense counsel responded:

> So, at this point, the Government has suggested that there is
> additional information that they can provide to the Court *ex parte*.
> And the Court may consider whether that information should be kept
> *ex parte*, kept sealed or not, but it is relevant.   I think it makes sense
> to at least fully develop the record, even if defense counsel is
> ultimately not able to know what is on that record, so that is just an
> issue for development of the record.

(Tr. 3/8/2019 at 16.)   Accordingly, the Court held an *ex parte* colloquy with the Government.

Afterwards, the Court reiterated that it believed that Juror 18 ought to be excused because of the

risk that he might not be fair and impartial.   After informing Juror 18 that he was excused, the

Court asked Juror 18 whether he had discussed the case with the other jurors or anyone outside the

jury, and he confirmed that he had not.   The Court credits Juror 18's representations based, in part,

on his observable demeanor in the courtroom.   The following trial day, March 12, 2019, Chambers

requested that the Court individually canvass all jurors concerning whether they had discussed the

case with Juror 18 or anyone else.   Finding no basis for doing so, the Court denied the request.

In support of his argument that Juror 18 tainted the jury, Chambers asserts that Juror 18

"intentionally lied to the Court [during *voir dire*] to get on the jury" so that he could advance the

Government's interest in securing a conviction.   (Def.'s Rule 33 Mem. at 16; *see also id.* at 12.)

He further contends that "the government was aware that the jury contained someone highly likely

---

[14] The Court credits these and the other factual representations made by the Government concerning when
and how it learned of this issue and the steps taken in response.

to be biased in favor of the government and willing to cover their tracks, becoming a de facto secret agent, a fifth column in the jury room." (*Id*. at 14.) Both of these claims are bereft of any factual support in the record.[15] Although it would have been preferable for Juror 18 to disclose his ongoing relationship with a retired FBI agent during *voir dire*, none of the questions at *voir dire* would have prompted, or perhaps even required, this disclosure. The nature of the relationship was also such that Juror 18 would not be inclined to disclose it spontaneously. Furthermore, there is no evidence that the Government sought to have Juror 18 empaneled on the jury as a "de facto secret agent," willfully concealed information about Juror 18's relationship with the retired FBI agent, or was otherwise dilatory in bringing the information about Juror 18 to the Court's and the defense's attention. To the contrary, upon learning of Juror 18's relationship with the retired FBI agent, the Government immediately instituted prophylactic measures, collected information concerning the nature and extent of the issue, and promptly disclosed the information collected to the Court and the defense.

Chambers next contends that the Court's receipt of information from the Government on an *ex parte* basis created an appearance of irregularity and undermined the integrity of his trial. It is difficult for the Court to discern a good faith basis for this argument. The Court was prepared to dismiss Juror 18 based on the Government's representations on the record, but Chambers requested that the Court hear the additional information on an *ex parte* basis in order to create a more fulsome record. Chambers cannot now assert that the Court's acquiescence to his own

---

[15] It is troubling that, as conceded at oral argument, the defense advanced the argument that Juror 18 not only lied during *voir dire* but did so for a specific and nefarious purpose despite the fact that the defense had not requested, received, or reviewed the *voir dire* transcript. It is also notable that the position being taken now—that Juror 18 was a prosecution plant who should never have been empaneled—is wholly inconsistent with the position taken at trial—that Chambers did not consent to Juror 18's dismissal. The Court is further troubled by the defense assertion that the Government's lawyers were not only aware of Juror 18's potential bias but actively sought to have him seated on the jury so that he could be "a fifth column in the jury room." (Def.'s Rule 33 Mem. at 14.) Such serious accusations should be levied only when supported by evidence, which is not the case here.

request provides a basis for a new trial.  *See United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015) ("this court has recognized waiver where a party actively solicits or agrees to a course of action that he later claims was error"); *e.g.*, *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (concluding that defendant who welcomed admission of evidence relating to gang membership waived right to appeal admission of that evidence); *see also United States v. Jones*, 763 F.2d 518, 524 (2d Cir. 1985) ("Defense counsel requests, which are granted by a trial court, are frequently raised as a claim of error on appeal.  We look with disfavor on this trial tactic.").

### C.  Claims of Prosecutorial Misconduct

Chambers' final claim is that he was deprived of a fair trial because of certain improper arguments made by the Government during its closing arguments.  Specifically, Chambers asserts that the Government: (1) misstated the evidence from the EbLens robbery; (2) improperly characterized him as the "master, the puppeteer" behind the robberies; and (3) made an improper burden-shifting argument.

"To secure relief from conviction based on prosecutorial misconduct, a defendant must show that the misconduct resulted in substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.  In assessing substantial prejudice, [courts] consider [1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements.  It is a rare case in which [a court] will identify a prosecutor's summation comments, even if objectionable, as so prejudicial as to warrant relief from conviction.  The law recognizes that summations—and particularly rebuttal summations—are not detached expositions with every word carefully constructed before the event.  Precisely because such arguments frequently require improvisation, courts will not lightly infer that every remark is intended to carry its most dangerous meaning."  *United States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (alterations omitted; citations

omitted; internal quotation marks omitted). The Second Circuit has "noted previously that the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.' . . ." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (quoting *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)). Consequently, "[a]n aggrieved party must show more than mere trial error to secure reversal; he must demonstrate misconduct so egregious that, when viewed in the context of the entire trial, it substantially prejudiced him." *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004) (citing *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)).

### i. The EbLens Remark

Chambers first argues that the Government misstated the evidence regarding the EbLens robbery. At trial, Officer Esquilin testified that he set up with the road crew near EbLens "maybe 10, 15 minutes prior" to his pursuit of Brown and that he had a clear view of the front door of EbLens from his position. (Tr. 3/12/2019 at 181.) During closing, Chambers argued that if he was truly involved in the robbery, he would not have told Brown that "now is a good time" to commit the robbery because there was a "cop in florescent yellow" in the line of sight from the front entrance to EbLens. (Tr. 3/15/2019 at 153.) In response to that argument, the Government encouraged the jury on rebuttal to: "Go back and look at the transcript. The police officer testified that he had just set up when Mr. Brown came running out." (Tr. 3/15/2019 at 166.) Chambers immediately objected to this remark, and the Court reminded the jury that "that it's their memory of the evidence that controls. So if there's a discrepancy in that, that's for them." (Tr. 3/15/2019 at 166.)

As an initial matter, the distinction between 10 to 15 minutes and "just set up" is not readily apparent and may be more a matter of perspective than contradiction. Even if this remark were improper, however, it did not deprive Chambers of a fair trial. This remark was an isolated

33

occurrence, and it was immediately followed by an objection from Chambers and a curative instruction from the Court. Moreover, the Government's evidence as to the EbLens robbery was particularly strong, and, therefore, this statement was unlikely to have had any impact on the jury's verdict.

### ii. The "Master" and "Puppeteer" Remark

Chambers next argues that the Government improperly referred to him as "the master, the puppeteer behind these robberies" because there is no evidence that he was the mastermind.[16]

"It is well established that the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *United States v. Coplan*, 703 F.3d 46, 87 (2d Cir. 2012) (quoting *United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003)). "The prosecution's explanation to the jury of its theory of a case does not constitute prosecutorial misconduct, particularly when the evidence supports the theory." *Branch v. Marshall*, No. 08-cv-08381 (PKC) (JLC), 2010 WL 5158632, at *14 (S.D.N.Y. Oct. 12, 2010), *report and recommendation adopted*, 2010 WL 5158633 (S.D.N.Y. Dec. 16, 2010). Here, the Government's theory of the case was that Chambers was the principal architect of the robberies. This was not an unreasonable position to take in light of the evidence presented concerning Chambers' superior knowledge about the locations robbed, his motive to retaliate against Nikita's for firing him, his status as Brown's older brother, and the evidence of Brown's increasingly erratic and rash behavior.

---

[16] The Government's complete remark was as follows:

> There is no way that Mr. Brown could have committed these robberies without Mr. Chambers' help. Instead, I would suggest that the credible evidence here demonstrates that, rather than a person just trying to help his brother, *Mr. Chambers was the one—the master, the puppeteer behind these robberies. He sent out his brother to commit them.*

(Tr. 3/15/2019 at 168 (emphasis added).)

The Court credits the jury's ability to recognize the remark for what it was—a rhetorical flourish. Although the government should always exercise caution when employing rhetorical devices, there is no blanket prohibition on them. *See United States v. Rivera*, 22 F.3d 430, 437 (2d Cir. 1994) ("the occasional use of rhetorical devices may be fair argument"). As Judge Learned Hand explained almost a century ago:

> While, of course, we recognize that the prosecution is by custom more rigidly limited than the defense, we must decline to assimilate its position to that of either judge or jury, to confine a prosecuting attorney to an impartial statement of the evidence. He is an advocate, and it is entirely proper for him as earnestly as he can to persuade the jury of the truth of his side, of which he ought to be thoroughly convinced before he begins at all. To shear him of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice;

*DiCarlo v. United States*, 6 F.2d 364, 368 (2d Cir. 1925).

Even if the Court were to find that the use of this rhetorical device was improper, however, the Court is not persuaded that the remark deprived Chambers of a fair trial given its fleeting nature and the strength of the Government's evidence, as discussed above. *See Tankleff v. Senkowski*, 135 F.3d 235, 253 (2d Cir. 1998) (rejecting prosecutorial misconduct claim where "the prosecutor's comments were short and fleeting, and thus much less likely to have had a substantial effect on the jury's verdict").

### iii. The "No Evidence" Remarks

Chambers also contends that the Government improperly shifted the burden of proof to him when it argued during its rebuttal that there was "no evidence" to support certain inferences advanced by the defense. Specifically, in response to the defense argument that the cell site evidence was consistent with Chambers going to his brother Lamar's house on the night of the Avenue Café robbery, the Government argued: "There's no evidence they ever went to his brother's house." (Tr. 3/15/2019 at 162; *see also id.* at 143 (defense argument).) The Government

also argued that there was "no evidence" that Brown, unlike Chambers, had a connection to Nikita's, Little Caesars, Avenue Café, or Bishop's Corner.  (Tr. 3/15/2019 at 169, 173.)

"[W]hen addressing the jury, a prosecutor must avoid commenting in a way that trenches on the defendant's constitutional rights and privileges.  For example, he may not permissibly comment on the failure of the defendant to testify, or invite the jury to presume in the absence of countervailing evidence that the government's view of the case is correct, or suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever." *United States v. Fell*, 531 F.3d 197, 221 (2d Cir. 2008) (alteration omitted; citation omitted; internal quotation marks omitted).  Nonetheless, a prosecutor "can argue the lack of trial evidence to support an argument urged by the defense." *United States v. Aquart*, 912 F.3d 1, 28–29 (2d Cir. 2018), *cert. denied*, No. 19-5489, 2019 WL 5875176 (U.S. Nov. 12, 2019); *see also United States v. McDermott*, 918 F.2d 319, 327 (2d Cir. 1990) ("a prosecutor is entitled to comment on defendants failure to call witnesses to contradict the factual character of the Government's case, as well as on defendant's failure to support his own factual theories with witnesses").  Such an argument becomes improper, however, "when the evidence that the defendant has not adduced is in the control of the defendant alone or where the jury would naturally and necessarily interpret the Government's summation as a comment on the defendant's failure to testify." *McDermott*, 918 F.2d at 327.

Here, the Court need not resolve whether any of the "no evidence" remarks constituted an improper burden-shifting argument.  Even if they did, the remarks did not cause substantial prejudice to Chambers.  After the jury was excused, Chambers objected to this line of argument. In response, the Court brought the jury back into the courtroom and provided a curative instruction that emphasized that the Government alone bore the burden of proof, that Chambers had no

obligation to present any evidence at trial, and that "[t]he Government cannot sustain its burden of proof based on the absence or lack of evidence."  (Tr. 3/15/2019 at 189–90.)  The jury is presumed to have followed these instructions, and there is no reason to believe under the facts and circumstances of this case that the Government's "no evidence" remarks otherwise deprived Chambers of a fair trial.  *See United States v. Young*, 470 U.S. 1, 11 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.").

## V.    Conclusion

For the reasons set forth herein, Chambers' Motion for Judgment of Acquittal (ECF No. 177) is DENIED as to Counts One, Two, Six, and Eight and found as MOOT as to Counts Four and Eleven.  The Motion for New Trial (ECF No. 199) is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of February 2020.

 */s/ Kari A. Dooley*                               
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE